## BRUSH *vs.* HOLLAND.

*In the matter of proving the last Will and Testament of* THOMAS BRUSH, *deceased.*

WHERE the testator was competent to perform a testamentary act, though in a state of weak bodily health, and mental inactivity,—*Held*, that a will executed the day before his decease, was entitled to probate, although its provisions were unequal; there being no proof of undue influence, and the leading features of the instrument being conformable to those of two prior wills, one made eighteen months, and the other five years previously.

ABRAM WAKEMAN,
J. J. LATTING, *for Proponents.*

WM J. COGSWELL,
J. H. BURRILL, *for Contestants.*

THE SURROGATE.—The decedent made his will on the first day of February, 1855, and died the succeeding day. By its terms, he gives to his wife, two thousand five hundred dollars, to be paid within two years after his decease, five hundred dollars per annum, for four years, and the premises thirty-four Ludlow street, New York, after the expiration of four years. These provisions are in lieu of dower. He then be-

queaths to his daughters, Jane, Fanny, Mary, and Caroline, two hundred and fifty dollars each, and to Catharine and Elizabeth, five hundred dollars each, to be paid three years after his decease; to his grandson, Thomas Holland, five hundred dollars; and his grandsons, Thomas Neet, Thomas Fish, Thomas, son of William Brush, and Thomas, son of Thomas Brush, jr., two hundred and fifty dollars each, to be paid on attaining full age. The rest of the estate, after providing an annuity of seventy dollars per annum for his son Thomas, is given to his four sons, William, Charles, Joseph, and John. This is, undoubtedly, an unequal will, taking in view the amount of the decedent's estate, preponderating largely in favor of the four sons named in the residuary clause.

The probate is resisted by the testator's daughters. The main question in the case relates to the decedent's testamentary capacity, and, on that point, the most important witness on the part of the contestants, is Dr. Oatman, his attending physician. The doctor states that he was sick during the summer of 1853, and for several weeks before his decease in February, 1855; that "asthma was the general leading difficulty;" that in his first attack, and during all the period, there were indications of "mental derangement," evincing itself sometimes in "loss of memory," "noisy, boisterous conduct," and "flightiness" or "delirium," and "incoherence." He says that the decedent recovered so as to walk out some time in September, but subsequently had slight attacks of the same disease until his last sickness,—that he attended him about two weeks during his last illness, and found him in the same condition as in the year previous, "with the exception of greater prostration physically, and decidedly mentally. His powers of mind had left him to a decidedly greater extent than before. His tongue appeared to be paralytic." The Doctor testifies that he saw Mr. Brush about seven o'clock, the evening before his decease—he was sitting up, but "seemed stupid," answered his questions "indifferently," or "not at all," "his answers were not to the point;" "in

course of conversation, Mr. Brush remarked, I think, that he did not know he was any worse,—that he had not sent for me professionally. Mrs. Brush remarked, that they had been doing a little writing, and had wanted me as a witness, but I was out, so they called on Mr. Perry. Mr. Brush said he was either making or altering his will—something to that effect. I then conversed, or endeavored to, with him, on the importance of making wills,—stated I had made one, and so forth. This was to draw out his mind; I could not do so in any manner, as he seemed indifferent both to that and all other topics I conversed upon. There was nothing connected, there was nothing of mind which could be useful to a man, there was no connected chain of thought. His mental and physical condition were so combined, you could hardly separate them." " For the last week, I do not think he was capable of doing any connected business, . . . or of making a will," that is, " an intelligent disposition of his property by will, having regard to the extent of his property and the number and situation of his children;" though during " the forepart of his sickness he might have done so," when " his mind was less affected."

. It will now be necessary to examine Dr. Oatman's evidence with some critical attention, and to compare it with the other proofs in the cause, in order to judge how far his recollection agrees with the facts as otherwise established. For this purpose it is important to distinguish between the attack of asthma, for which he prescribed in the summer of 1853, and that which terminated in the testator's decease in 1855. Now in the first place, it is worthy of attention that during the sickness of 1853, the symptoms of the patient were considered mortal, and the physician thought his spasms so dangerous that he was likely " to pass off in one of them ;" there was a period when " he became comatose and stupid." He says, " This was in June or July, perhaps one week, when I named to Mrs. Brush that he would die, but he revived. There were delirium and comatose symptoms, analogous to symptoms during his last sickness—there was a paralytic state approach-

ing." Secondly, the Doctor made this illness last from March to September, during which period he visited him, some days " half a dozen times," and again, " not for several days," and he refers this to April, May, June, and July, the decedent being " sick pretty much all the season," and in June and July " very sick." Thirdly, the Doctor states that " running through the series of months of the first sickness, he was off from his balance, and there was derangement of mind," which manifested itself the " first day" he called to see him.

Now the memorandum of his professional visits furnished me by the Doctor, with the consent of the counsel, after his examination was closed, shows twenty visits in July, " mostly after the 15th," and thirty in August, " mostly between the 10th and 19th." This presents altogether a different state of affairs from a sickness running through " April, May, June, and July." But again, let us see what this " mental derangement" and " imbecility" was, which was so patent at the Doctor's first visit. Upon his cross examination he says, " this mental derangement was the result of intoxicating drinks, his free manner of living, and the medicines which I had to give, such as lavender, ether, and other stimulants. . . . During that six months, my impression is, he was always under the action of stimulants, liquor or stimulants which I was prescribing. When I speak of mental derangement during that period, I have reference to the result of this stimulating treatment, and the effects of his disease." The Doctor made an effort to " substitute other articles instead of liquor," but was unsuccessful.

If we turn now to the last illness of the decedent, we shall find, at least, one cause of " mental derangement" absent. It appears that after the decedent's recovery in 1853, his physician persuaded him to leave off the use of spirituous liquors ; and during his last illness, the doctor says, " he was not then using intoxicating drinks—not to my knowledge. I did not prescribe any. I saw him take gin and other liquors, but not to excess, that I am aware of." " During the first week, he talked freely with me, and quite unlike the first

week of his previous sickness. His conversation was to the point, collected and no repetition." This, the Doctor says, did not continue; he "first discovered mental imbecility about five days before he died." It was exhibited, so far as I can discover, chiefly if not wholly in not answering questions as to his condition, in agreement with his wife's statements—and "indifference"—"aversion to converse—a want of inclination to carry on a conversation in a connected form:" at times "he seemed very indifferent and stupid." The Doctor also says, that his impression from the beginning was that he could not recover; and he thinks he disclosed his situation to his wife—that "fatal symptoms were indicated" for a week before his death—that "his brain had been congested for a week"—the asthmatical symptoms disappeared to a great extent the last two or three days, and his laborious breathing seemed to have subsided. The last evening of his life he found him sitting up; there was no spasm. In reply to his questions, he answered him "incorrectly and incoherently." Now I would remark, that in the same breath with this last statement, the Doctor corrected a most important piece of evidence given by him on his direct examination on a previous occasion; and this mistake shows to my mind that his memory as to the occurrences of that interview cannot be depended upon, for strict accuracy. He first testified that this very evening he remarked to Mrs. Brush, in the decedent's presence, "without his seeming to notice it, that his mind was affected," and "she said he was so crazy all night she did not know what to do with him." The Doctor candidly confessed and rectified this error, after being satisfied of his mistake, upon a conference with Mrs. Brush, and placed the occurrence several days anterior; but if his memory was at fault in a fact of that kind, so special and noteworthy, it would certainly be dangerous to rely entirely upon his accuracy in other particulars. There is one circumstance however to which he alludes, that illustrates how easily wrong inferences may be drawn from premises which rightly understood call for conclusions quite the contrary.

VOL. III.—30.

At this interview, when the Doctor came in, he says the decedent observed that he had " not sent" for him—he " was not so much worse as to have sent for him." A remark of this character to a physician who was attending him regularly every day, would, unexplained, indicate wandering: but I take the Doctor's first statement on this point as most strictly correct. " In course of conversation, Mr. Brush remarked, I think, that he did not know he was any worse; that he had not sent for me *professionally*." As the decedent, shortly before the Doctor's call, had sent for him to witness his will, that circumstance sheds light upon this observation, rendering it both intelligent and indicative of a state of mind just the opposite to what the Doctor supposed it to have exhibited. It is also proper to add, that the very morning the decedent died, as he lay in a sluggish condition, nearly at his last breath, he recognized the Doctor by a squeeze of the hand, answered some of his questions, and others not, in the same mode; and the Doctor says—" I suppose he might . have rallied to answer any of them, if I had pressed it."

Dr. Tuthill visited the decedent two or three times with Dr. Oatman, about a week previous to the 20th August, 1853, and then, during Dr. Oatman's absence from town, down to the 26th, inclusive. He says the decedent was " in a half-stupid state," caused both by his disease and the medicine he was taking—ether." He seemed " to be very forgetful—he said but very little, but what he did say was not at all times rational. He would make remarks that were not reasonable often; he would repeat his questions at short intervals, forgetting that he had asked them. Sometimes he would converse with me fifteen or twenty minutes as rationally as any man, and then again it would not be so."

Sarah Brush, a sister-in-law of the decedent, residing in the town of Hempstead, states, that she had been in the habit of prescribing for him and his family botanically, many years; that on the 14th of August, 1853, John Brush called on her, to come to New York, to see his father; that about two weeks after, Joseph Brush having called upon her, she came

to the city, and saw the decedent. She says, " he was mise-
rable then, but not so much so as he had been ; he said he
had been more ill than he was then." He stated that " he
had been sick and confined to the house about four weeks—
the last of July he was taken." He was taking laudanum
and anodynes, and " seemed to be a little torpid and sleepy
by spells." " I don't think he had an insane mind, not at
that time." " His sleepless nights and his affliction seemed
to make him different, a little torpid." " He said he was
very bad when he sent for me by John."

This is about the sum of the evidence adduced by the con-
testants, tending to impeach Mr. Brush's capacity. It must
be remembered, that if Dr. Oatman's impressions were cor-
rect, the decedent, during a period of some six months, in the
spring and summer of 1853, was constantly under the influ-
ence of intoxicating liquors and stimulants. And yet, on the
other hand it is very clearly shown, that about the first of
May, 1853, Mr. Brush commenced altering some buildings
he owned in Delancey-street, and superintended the work
himself, until about the middle of July, when he placed it
in charge of Baldwin & Devoe, builders. About that time
his health became worse, and he was no longer able to give
his personal attention to the buildings. Some difficulty had
already occurred, through incompetent workmen, which, in
connection with the state of his health, led him to give up
the superintendence ; but still the evidence shows that he
was not confined to the house until about the first of August,
and that even after that date he gave directions, more or less,
in regard to the prosecution of the work. At the time Bald-
win & Devoe were employed, he was able to walk out ; Bald-
win's clerk says he was in and out of their store every few
days, and he saw him up to the first of August ; Gifford, the
painter, testifies that he came to his store to employ him the
last of July, he went to work the first of August, and Brush
gave him directions as to the colors about a week after,
during which period, though feeble, he was out every day.
Mr. Chichester states, that the decedent applied to him in

July for a loan on bond and mortgage, which was consummated on the 19th of that month. McIntee, the plumber, says he worked at the buildings two weeks, and finished about the first of September; that Brush, though sick, gave him directions, and one day " was up and out in the yard." Tompkins, a paper-hanger, produced a receipt dated August 15, 1853, and testified that shortly before the work was done Mr. Brush had left the order at his store, personally. Mr. Devoe says that Mr. Brush was present during the progress of the work, and sometimes gave directions, except when he was confined to the house, some few weeks. Mr. Baldwin testified that the decedent first called on him, in reference to his buildings, about the first of July; they examined the premises together, and Brush suggested some changes; the bills running from two hundred to a thousand dollars, were rendered every week, and settled by money or notes; for the first two or three weeks he saw Mr. Brush about the work; after that, he was confined by sickness, but he saw him almost every day before the 1st of September, and generally talked with him about the progress of the building, except three or four days, when he was very ill, and confined to his bed. These witnesses establish satisfactorily that Mr. Brush was out, and capable of attending in a measure to his business, until about the first of August; and not one of the parties specifies any circumstance tending to show intoxication or mental derangement, during the period covered by their testimony. But, on the contrary, there is entire agreement among them all, that in respect to capacity and rational conduct, no difference was observed from his usual deportment and conversation. We must be compelled, then, to limit the evidence of the attending physicians, as to his mental condition, to a period subsequent to the middle of July, and probably commencing about the beginning of August; and even then I do not know that the evidence would justify any stronger statement than that, while under the influence of stimulants or anodynes, he was in a state of torpor, sluggishness, or mental inaction. Certainly, there is nothing to cor-

roborate and everything to oppose Dr. Oatman's recollection, that for a week in " June or July" he was " comatose," and that during " six months" " he was always under the action of stimulants." Not that I doubt that a period of great prostration supervened, some time or another, but as to the time when this occurred and the length of the sickness, the Doctor is manifestly mistaken. If, " as a general thing, he was in a state of intoxication," it is remarkable that the other witnesses never observed it. Dr. Tuthill and Mrs. Brush probably gave a more accurate idea of the time the disease was in greatest force—somewhere from the fourteenth to the twenty-fourth of August.

In respect to the decedent's last sickness, Dr. Oatman states, that he understood from the family he had been unwell about three weeks before his decease, and that he attended him two weeks, and the decedent was " very sick when he was called in." John May testified, that he met Mr. Brush in Eldridge-street " a very few days before his death ;" he says, " I don't know exactly how long it was—it might have been a week before his death, but I don't think it was longer." The witness conversed with the decedent, and observed no change in his mind or health. Mr. McPherson passed Mr. Brush in the street, he testifies, " a very short time before his death—should think inside of a month—less than two weeks ; for when I saw his death, it struck me very forcibly, I had seen him so short a time before." The decedent was in Baldwin's store, and paid money, on the 6th of January ; he called on Mr. Robert Ray, at 54 Wall-street, about the middle of January, paid him interest on a mortgage, and proposed to liquidate part of the principal in May following. Mr. Ray says, " I never saw Mr. Brush otherwise than sane in his mind." Mr. Anderson, a builder, deposed, that he met the decedent about a week before his death, at the corner of Hester and Ludlow streets, stood there and talked with him, and Mr. Brush accompanied him to his shop, 67 Hester street. He states, "I thought no more about it, till I saw his death in the papers, and then I would not believe it was

Thomas Brush—it seemed to me two or three days since I had walked with him; he appeared to me in as good health as usual, but he was generally complaining of the asthma; I thought his mind was as good then as ever I saw it." On cross-examination, the witness said, " I would not be willing to qualify that it was not two weeks before his decease that I last saw him, but I think a week would be nearer the mark." Mr. Anderson, the Health Warden, testified, that the decedent called at his house sometime in January, about the middle, upon official business relative to the Delancey-street house, and about a week after met him in the street, and spoke with him, on the same subject. He says, "I did not see but what his mind was as well as ever it was." McIntee, the plumber, called on Mr. Brush about two weeks before he died, to attend to some repairs at his residence. He found him sitting at the table, and while he was there Mr. Brush rose and walked to the window. He says, " I discovered nothing different as to his mind." John Canter hired a room at 46 Delancey street, and paid his rent in advance, " on the 22d or a few days after." His statement is, that on the Saturday succeeding the 22d of last January he paid his rent to the testator in person ; that Mr. Brush counted the money, and gave a receipt ; in the course of conversation, the decedent said that he felt weak, and he thought this attack would carry him off; that there was a number of receipts upon the table, from which Mr. Brush picked out his and handed it to him. James Meehan hired apartments from the testator " in the last week of January last." When the witness went into the room, he was sitting on a chair at the side of the bed, but as soon as he discovered the object of the visit, " he got up, came into the other room and attended to the business." He says, " Mr. Brush did not say anything, except when I spoke for a floor in the woodhouse, he said a few dry boards would do. I know it was the last week of the month we went in ; Mr. Brush died in about a week after that, as I understand." Samuel Smith deposes, that on the 29th of January he hired rooms of the decedent ; he found him sitting up ; Mr. Brush

filled up a printed form of a receipt for the rent, and signed it; Mrs. Brush assisted him to go from his chair to the table, to write it; he appeared to be feeble, and to speak and breathe with difficulty. The witness had been his tenant before, and there was some conversation between them. Mr. Smith says, " he appeared to conduct his business the same as usual, and to converse sensibly." Robert Anderson, one of the decedent's tenants, testifies, that his rent was due January 1st; that he was in arrear, and towards the latter part of the month Mr. Brush called at his house; that he promised his rent in about a week; that he called in about a week or little more, to let him know he had been disappointed, and found him dead. He says, " he was laid out, to my astonishment."

In speaking of Mr. Brush's condition during his last illness, Dr. Oatman says, " he was the same as the year previous, with the exception of greater prostration physically, and decidedly mentally. His powers of mind had left him to a decidedly greater extent than before." In view of the fact that there is no allegation Mr. Brush was using stimulants to excess at any time during his last illness, and giving just weight to the mass of testimony adduced in relation to his business transactions a short period before his decease, there seems, generally speaking, no solid reason for doubting his testamentary capacity. There may have been and probably was a certain degree of torpor and mental inactivity, a sluggish condition of the mind needing excitement and effort to arouse its powers. But such a state does not amount to legal incompetency, provided the intellectual powers when excited to action work normally ; and cases of this character can be judged correctly only by actual observation at the time the transaction which is the subject of investigation and criticism is in process of performance. It becomes necessary, therefore, to examine carefully the manner in which the preparation and execution of his last will were accomplished; and, in order properly to understand the circumstances, we must go back some years, and trace the history of the decedent's testamentary acts. As remotely as July, 1849, nearly six

years before his death, Mr. Brush executed a will in the presence of John C. Smith and Thomas Bradley. This instrument has been preserved, and its leading provisions are generally similar to the last will, which is now the subject of contestation ; small legacies are given to his daughters and several of his grandsons who bear his name; certain parcels of real estate are given to his wife and his sons, and the residue is divided among his five sons. Mr. Bradley drew this will, and both he and Mr. Smith were examined as witnesses; and there is not a particle of evidence going to impeach the validity of the instrument. The next will was executed the 15th of August, 1853 ; by its terms, the provision for his son Thomas is changed into an annuity of seventy dollars per annum ; the legacies to the daughters are postponed to the period of three years after his death, and a legacy of one thousand dollars is given to his wife, occasioned it would seem by changes made as to the condition of his real estate. By the will of February 1, 1855, no material alterations are made in respect to the legacies, except an enlargement of the bequest to one of his daughters, from two hundred and fifty to five hundred dollars ; and also of the bequest to his wife, from one thousand to two thousand five hundred dollars — the devise to her of real estate having been altered, and as I understand, reduced. The will of August, 1853, was drawn by Mr. Simonson, and witnessed by him and Mr. Devoe. Mr. Devoe's recollection of the transaction is very indistinct; he says, Mr. Brush made some remark, from which he understood the nature of the paper—he replied, "it was something we all had to do." The decedent was sitting in a chair, but appeared to be feeble ; the witness thought him rational, and observed nothing indicating unsoundness of mind. Mr. Simonson testified, that Mr. Brush was at his house in Jamaica on the 18th of July, when he executed an assignment of a mortgage; that within a week or two before the 15th of August, the decedent, while at his residence in Jamaica, requested him to come down to New York and write his will ; that on the day the will was executed he met Mr. Brush on the side-walk ; they proceeded to his room, and

he there drafted the will from the testator's instructions. No one, he testifies, was present, unless that Mrs. Brush may have passed in and out. He says, "Mr. Brush particularized all he wished done; I took it down on paper, whom he wished to give to, and what, and then I made the will. All the particulars were taken down." "I asked him why he put off the legacies to the daughters so long; he said it would give an opportunity to pay up, so that the property might be made clear. He gave no reason why he gave one of his sons seventy dollars a year." . . "I may have been engaged in drawing the will two hours or perhaps longer." "After I had written it I read it over to him." "He was sober; his mind appeared to be sound. I had no doubt whatever of it; his conversation was very rational, as much so as I ever saw; I saw nothing out of the way at that time. I did not see him use any intoxicating drinks that afternoon." This evidence seems clear, but there are points in respect to which it is urged that Mr. Simonson's memory is at fault. He says, that the will of August, 1853, was drawn in the same room where he drew the will of February, 1855, while the proof shows that at the former period Mr. Brush was occupying apartments in the building on the rear of the lot, and at the latter date was living in the front building, on the street. In the intricacies of a tenant house this confusion as to localities may have arisen, without much fault in the memory. But the witness also states, that in August, 1853, Mr. Brush made no complaint as to his health, did not state he had been ill, but was "going about" apparently as usual. This hardly seems likely, and there must be some hesitation therefore in trusting implicitly to Mr. Simonson's recollection of all the circumstances. Still it must be remembered that the disease with which the testator was afflicted was of a spasmodic character, relenting frequently in the force of its symptoms, and often sudden alike in its accession and departure. "The disease is often of long continuance, and may to a certain extent become habitual," (*Copeland's Med. Dict., Art. Asth.,* 35); and in the intervals between the paroxysms the patient

is capable of motion and physical exertion. During this sickness McIntee saw the decedent one day in the yard, and it is not impossible that Mr. Simonson met him on the sidewalk, on the 15th of August. Still, supposing him to be mistaken on that point, he is a respectable, intelligent, and credible witness, and it does not follow that his memory is not deserving of reliance upon a subject in which his mind was engaged, although it may be defective as to secondary circumstances. He was there by the testator's request, to draft his will, was occupied in the affair some two hours, and, unless his memory was most seriously impaired, must have preserved a tolerably distinct recollection of the transaction.

The date of the last will, in February, 1855, ensures on the part of Mr. Simonson a more sure memory, and he not only narrates the details with much greater particularity, but he is not shown to have committed any mistake as to the surrounding collateral circumstances. He states, that he was sent for, at the request of Mr. Brush, and he produces the letters that called him, written by Joseph Brush, one dated the 22d and the other the 28th of January. He says, he arrived at the decedent's house about one o'clock on the first of February; found him sitting up in a chair; Joseph, Charles, Mrs. Brush, and one or two more of the family were present. The decedent, on being asked as to his health, said he had been sick about thirty days; that he was " poorly," though " much better than he had been." He inquired why Mr. Simonson had not been there before, and after receiving the explanation that his letters had just been received, directed his wife to get the old will. That instrument, on being produced, was sealed up in the same envelope in which it had been placed in August, 1853. The witness opened it, told Mr. Brush to look at it while he was at dinner, and then withdrew. He thinks that before he went to dinner, Mrs. Brush told the testator that he ought to give Catharine $250 more. On his return, after dinner, Mrs. Brush was the only person in the room, and she soon left, remaining however

within call. He then proceeded to draw the will from the testator's instructions. The witness says, " he showed me the alterations he wanted, namely, to give his wife fifteen hundred dollars more, and one of his daughters two hundred and fifty dollars more : he said he had sold a piece of land some time previous, and that was the cause of the alterations chiefly." After the will was drawn and read to him, Mr. Brush said it was all right, and directed that Dr. Oatman should be sent for, as a witness ; word was brought that he was not at home, and he suggested calling Mr. Devoe ; and when he also was reported as absent, he named Mr. Perry. The whole affair occupied all the afternoon until dark, and the will was signed by candle-light. Mr. Simonson states, that he talked with facility, and his voice was as usual ; he breathed short and hard ; after giving the instructions, he got up from his chair, walked into the other room unassisted, called to his wife, and laid down in bed for almost half an hour, then rose and resumed his chair. During the course of the afternoon, a woman came in to pay rent, and he counted the money. When Mr. Perry came in, he rose from his chair, " came round to the table, and signed the will," " without any assistance." Mr. Simonson says, " after the will was signed, sealed up, and delivered to him, I left in a few minutes. We conversed on other subjects. He had assigned a bond and mortgage to Stephen Tyson, whose business I do, as security for $1000. The mortgage was for $2400, and he told me he should want the $1400 in the spring, the 1st of May. I said I would tell the mortgagor. When I left, I shook hands with him and bade him good night, and he said, "I shall be up in Jamaica in a few days." "I observed nothing on the 1st of February different from the usual state and condition of his mind. I never observed any indications of mental derangement, or loss of memory, or incoherence of language. I have not known any case of his being influenced by other persons." Mr. Perry, the other subscribing witness, testifies to the usual statutory ceremonies. He also states, that he asked Mr. Brush how he was, and he replied " he felt

very bad—he was very sick. He said it was his old com-
plaint, the asthma." "I did not observe," he says, "any-
thing particular out of the way with Mr. Brush, when the
will was signed; in fact I did not give it a thought; it was
done in a moment;" he "appeared to be very feeble indeed,
though he was sufficiently strong to get up, walk to the table,
and sign the will. My attention was not called particularly
to his testamentary capacity, one way or the other."

Some effort was made in the progress of the case to attack
the general capacity of Mr. Brush when in a state of health,
and to show that toward the close of his life his mental pow-
ers had become impaired, but nothing worthy of notice was
given in proof, except intemperate habits, and occasional con-
duct according with his habits. The "derangement" conse-
quent upon the excessive use of stimulants ordinarily passes
away with the exciting cause, and the decedent's case does
not seem to be an exception. Indeed, it is generally agreed
that latterly his habits had improved; he had become more
temperate; and during his last sickness, there is no pretence
of any improper indulgence. In this connection, it may be
observed, that at the time the last will was executed, Mr.
Simonson states that he saw no liquor, and did not perceive
any signs that the decedent had been drinking. In respect
to the use of intoxicating liquors, as one of the witnesses
expresses it, "he was quite an altered man." Taking in view
all the circumstances which appear in evidence as to the
management of his property and business, even during the
period of his sickness in 1853, and down even to the 29th of
January, 1855—his receipt of which date, filled in by his
own hand, and reciting the letting of apartments to Charles
Smith, is before me—it is impossible to deny that he was
abundantly able to take care of his property and dispose of
it with sense and intelligence. It may be, that whilst labor-
ing under the attacks of an afflicting disease, his capacity
was fluctuating, and after the paroxysms had subsided he was
listless, desirous of repose, and reluctant to be aroused. But
I certainly cannot discover, in any portion of the facts stated

by Dr. Oatman to have occurred the evening of the day the will was consummated, the signs of mental imbecility. He told the Doctor he had not sent for him professionally; but that, as I have observed, was a mark of intelligence. His disinclination to converse, when the Doctor attempted to pursue the conversation, was natural, if we reflect upon the excitement and fatigue consequent upon the protracted interview with Mr. Simonson. He had sent for the physician to be a witness to his will—certainly without any suspicion that he was summoning a witness who doubted his power to dispose of his property—and that purpose having failed, there was no object in talking further on that subject. There is one circumstance which occurred at the time the will was signed affording to my mind collateral evidence of the decedent's command of his faculties, and that too in a way which is all the more convincing, because it harmonizes with proof from separate and disconnected sources. Robert Ray testified, that when Mr. Brush called on him, in the middle of January, he proposed to liquidate part of the principal sum due upon the mortgage on his houses, upon the first of May ensuing. Mr. Simonson says, that the interview between him and Mr. Brush closed, on the first of February, by the latter telling him that he would want the $1400 due on the Tyson mortgage the first of May, and requesting him to apprise the mortgagor. This is one of those straggling facts which often appear among the circumstances of a case, apparently of little value in themselves, but deriving importance and weight from being linked with others, and furnishing in an unexpected manner corroboration and support to the more prominent incidents in dispute. It may seem strange that Mr. Brush, the very night preceding his death, should have spoken so cheerfully to Simonson of his prospect of seeing him soon in the country; but his sister-in-law testifies to something pretty much of the same character, during his sickness in August, 1853; and Dr. Oatman thought that illness would prove fatal as well as the last. The truth is, the decedent's death was sudden; the day before he was able to walk about

his room; his signature to the will is quite equal to his usual subscription; and he could hardly have supposed, in the present state of his physical powers, that his end was so near. I conclude therefore, upon the whole, that there is no reason to doubt the accuracy of Mr. Simonson's memory, in respect to the interview when the will was executed; and that being the basis of my reasoning, I must find that the testamentary act now in question had the intelligent sanction of the decedent.

That it was the offspring of his own mind there is no reason to doubt. Isaac Hendrickson says, that in 1854, when Mr. Brush had been drinking, he said, "I have made two wills—I think I will go home and destroy them, and let the law settle my affairs"—"that would be equal;" but that declaration stands alone. It shows he had two wills, and that they were not "equal;" and moreover, the result proves that he did not go home and destroy them. There is not another fact in the case repugnant to the idea that his last will was conformable to his real wishes. His conduct in respect to the general purport of his testamentary provisions had been consistent and uniform for more than five years. The cardinal feature of his several wills was a fair provision for his widow, the division of his real estate among his sons, and the bestowal of small legacies upon his daughters and namesakes. This appeared in the will of 1849, when there is not the shadow of a pretext for suspecting his general capacity. His wife at that time consulted with Mr. Bradley, to see if some mode could not be adopted for making that will permanent, and incapable of revocation; but that solicitude was occasioned by fears lest he should unadvisedly make way with his property when under the influence of liquor; and when this will was executed, the evidence shows he was rational and sober. He subsequently became displeased with one of his daughters, and erased the bequests in her favor, on the face of the will; so that when taken sick in August, 1853, it became necessary to make a new will, unless he designed to die intestate. In December, 1854, he sold some

real estate, and this led to a further provision for his wife, in lieu of her interest in the land alienated. The only other alteration was an enlargement of the bequest in favor of his daughter Catharine, and on that point alone his wife seems to have made a suggestion. Now in all this no trace of any undue influence is indicated. So far as the contestants are concerned, the same intention was manifested for a number of years and in all the three wills; and the changes that were made in other respects, so far as the causes have been disclosed, were consequent upon a change of circumstances. Dr. Oatman says "he was a man of indomitable will," and I cannot discover but that he had his own way and will to the last. The only suspicious circumstance to be found in the conduct of the parties interested in favor of the will, is the erasure by Joseph of the marginal notes made upon the will of 1853; but as he explains these memoranda, they related to the proposed alterations in favor of his mother, which, it must be remembered, took nothing away from the daughters' shares, but only infringed upon the sons' portions. His conduct, in obliterating these memoranda, was inexcusable, but at the same time I cannot see why innocent parties should suffer for his fault. It was also urged, that the decedent's sickness was concealed from his daughters living on Long Island. The evidence is not conclusive on this point; and moreover, a motive for the alleged concealment was wanting, at least so far as the interests of the sons were involved. They had nothing to gain by the new will, and were not interested in procuring its execution. In a pecuniary sense, it would have been better for them had the testator died without modifying the will of 1853.

It thus appears that the dispositions contained in the instrument now under contestation, in their relations to the parties desiring to invalidate it, were deliberately persisted in for a term of years; were formed when his health was good and his faculties confessedly unimpaired; and therefore were not the product of any undue influence exerted upon him during

the two attacks of disease towards the close of his life. In fact, the interests of the daughters and their children, except as to the terms of payment of the legacies, were as well cared for by the last as by the first will, in 1849; and they suffered nothing by the subsequent alterations, save in the postponement of their legacies for two years. This is a controlling circumstance in the consideration of the question of fraud and imposition, and it is impossible to escape its force. Had the last will shown a departure from previously expressed wishes and declarations, or indeed had it failed in being supported by proof of a settled purpose in harmony with its provisions, there might have been some room for regarding the act with jealousy; but looking at all these three instruments together, tracing their history, and the causes which led to the modifications of the first two, I cannot, in the absence of all signs of effort to influence the testator's mind, come to any other conclusion than that his true will, as to the disposal of his estate, was contained in the paper executed by him the day before his decease. It is therefore entitled to probate.